UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                   :

UNITED STATES OF AMERICA      :
                                   :

         - v. -            :                   S1 18 Cr. 284 (KMK)
                                   :

EDWIN GUERRIER, et al.,      :
                                   :
                                   :

            Defendants.     :
                                   :
------------------------------------------------------x

## THE GOVERNMENT'S OPPOSITION TO
## DEFENDANTS' PRETRIAL MOTIONS

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007

Samuel L. Raymond
Assistant United States Attorney
     *- Of Counsel -*

# Table of Contents

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ........................................................................................................... 1

I.      The Investigation ......................................................................................... 1

II.     Procedural History ....................................................................................... 3

ARGUMENT ................................................................................................................ 4

I.      Judge Seibel Properly Authorized Interceptions Pursuant to Title III ............ 4

        A.      Applicable Law ................................................................................. 4

                1.      The Requirements of the Wiretap Statute ................................ 4

                2.      The Standard of Review ......................................................... 5

                3.      The Necessity Requirement ................................................... 6

                4.      Minimization Procedures ....................................................... 7

        B.      Discussion ...................................................................................... 8

                1.      The Guerrier Wiretaps Were Supported by Probable Cause ..... 8

                2.      Agent Bryceland's Affidavits Satisfied the Necessity Requirement ......... 9

                3.      Sweat's Minimization Argument is Frivolous ......................... 12

II.     The FBI's Search of Guerrier's Home was Lawful ....................................... 12

        A.      Applicable Law ............................................................................... 12

                1.      Probable Cause ................................................................... 12

                2.      Good Faith ......................................................................... 15

        B.      Discussion .................................................................................... 16

                1.      Judge Smith Correctly Found There Was Probable Cause to Search
                        Guerrier's Home ................................................................. 16

                2.      In the Alternative, the Agents Relied on Judge Smith's Warrant in Good
                        Faith ................................................................................. 20

III.    The Court Should Reject Tamika Sweat's Motion for a Bill of Particulars ..... 20

        A.      Applicable Law ............................................................................... 20

        B.      Discussion .................................................................................... 21

IV.     The Superseding Indictment is not Duplicitous as to Tamika Sweat ............. 21

A.    Applicable Law .................................................................................................. 21

B.    Discussion .......................................................................................................... 22

V.    There is No Basis to Sever Eugene Johnson's Case From his Co-Defendants' .............. 22

A.    Applicable Law .................................................................................................. 22

B.    Discussion .......................................................................................................... 24

VI.   The Government Will Not Seek to Introduce Edwin Guerrier's Statements to Law

Enforcement as Part of Its Case-In-Chief ........................................................................ 25

CONCLUSION ............................................................................................................. 25

## PRELIMINARY STATEMENT

Defendants Tamika Sweat, Edwin Guerrier, William Jones, Maurice Murphy and Eugene Johnson have filed various pre-trial motions. Sweat (in the "Sweat Motion"), Guerrier (in the "Guerrier Motion"), Jones (in the "Jones Motion"), and Murphy (in the "Murphy Motion") seek to suppress phone calls and text messages intercepted pursuant to three Title III wiretaps issued by the Honorable Cathy Seibel during the FBI's investigation of this case[1]. Guerrier seeks to suppress materials seized from his home on March 22, 2018, pursuant to a search warrant signed by the Honorable Lisa M. Smith. Sweat moves the Court to require the Government to provide her with a bill of particulars; and to dismiss the Indictment against her as duplicitous. Eugene Johnson (in the "Johnson Motion") moves to sever his case from his co-defendants. Guerrier also seeks to suppress statements he made to law enforcement after his arrest on March 22.

The Government does not plan to submit to the jury Guerrier's post-arrest statements, so his motion on that ground is moot. The Court should deny all other motions filed by each defendant.

## BACKGROUND

### I.    The Investigation

Beginning in 2017, the Federal Bureau of Investigation ("FBI"), the City of Newburgh Police Department, the Orange County Sheriff's Office, among other law enforcement agencies, investigated a drug trafficking organization (the "DTO") responsible for the distribution of resale amounts of cocaine in and around Orange County, New York. Over the course of the investigation, law enforcement identified Edwin Guerrier as a large scale cocaine trafficker in Newburgh. Carlos Fabian, in the Bronx, supplied Guerrier with multiple kilogram shipments of cocaine.

---

[1]  Johnson implicitly also joined this motion.

1

Fernando Ferrer couriered the drugs to Guerrier at his house in Newburgh.  With the assistance of Tamika Sweat, Guerrier re-distributed resale quantities of cocaine to drug dealers in Newburgh, including Jones, Murphy, Johnson, and Torren Stubbs.

The FBI investigated the DTO through multiple avenues, including a Title III wiretap. On or about January 18, 2018, FBI Special Agent Christopher Bryceland applied to the Honorable Cathy Seibel for authorization to intercept communications over Guerrier's cellphone number ending in 8586 (the "8586 Number").  As described in the affidavit (the "January 18 Bryceland Affidavit" or "January 18 Bryceland Aff." attached to Tamika Sweat's motion as Exhibit C, pages 1 through 34 as paginated by ECF), a confidential informant had purchased hundreds of grams of cocaine directly from Guerrier and Jones in controlled purchases; as of December 2018, the informant had arranged to purchase the cocaine from Guerrier by contacting Guerrier via the 8586 Number.  (January 18 Bryceland Aff. § II.C.2).  Toll records showed that Guerrier, using the 8586 Number, was communicating with other known (William Jones) or suspected (Eugene Johnson) drug dealers.  (*Id.* § II.D).  In his affidavit, Agent Bryceland also detailed the entirety of the FBI's investigation into the DTO, including the successful investigative steps and those that had failed, appeared unlikely to succeed, were too dangerous to employ, or would compromise the investigation.  (*Id.* § III).

Judge Seibel approved the wiretap on January 18, and pursuant to additional affidavits by Agent Bryceland (the "February 16 Bryceland Affidavit," attached to Tamika Sweat's motion as Exhibit C, pages 35 through 64 as paginated by ECF, and the "March 19 Bryceland Affidavit," attached to Sweat's motion as Exhibit C, pages 65 through 103 as paginated by ECF; collectively, all of the affidavits are the "Bryceland Affidavits"), renewed the authorization on February 16 and March 19, 2018 (collectively, all of the wiretaps are the "Guerrier Wiretaps").  Consistent

with the requirements of Judge Seibel's Orders of Interception, monitoring agents attended a minimization meeting on January 18, 2018 and then March 19, 2018.

On or about March 20, 2018, the Honorable Lisa M. Smith, United States Magistrate Judge for the Southern District of New York, approved a search and seizure warrant for 1113 Maggie Road, in Newburgh, pursuant to an affidavit by Agent Bryceland (the "Guerrier Search Warrant," attached to Declaration of Theodore Green in support of Edwin Guerrier's Motion to Suppress, as Exhibit A).

On or about March 22, 2018, agents with the FBI, surveilling 1113 Maggie Road, observed a man drive up to the house in a white sedan, enter the house appearing to hold something, and then exit carrying a bag. (Complaint, Dkt. No. 1 ¶ 29). The man reentered the white sedan, and began driving, before he was stopped by law enforcement and identified as Fernando Ferrer. (*Id.*) FBI agents then executed the Guerrier Search Warrant, where they found, among other things, Edwin Guerrier, and numerous packages that appeared to be, and were later confirmed to be, three kilograms of powder cocaine, as well as what was later determined to be more than 91 grams of cocaine base. (*Id.* ¶ 30). FBI agents arrested Guerrier and Ferrer, and soon thereafter, Carlos Fabian, on the basis of probable cause, for violations of Title 21, United States Code, Section 846. (*Id.* ¶¶ 30 – 32).

Upon Guerrier's arrest, he was read his *Miranda* rights and provided with a *Miranda* form. He initialed the form but said he did not want to speak with law enforcement. Thereafter, law enforcement agents engaged in periodic conversation with Guerrier, about 1113 Maggie Road, and his personal life.

## II.    Procedural History

On or about April 12, 2018, a grand jury in the Southern District of New York returned

an indictment, charging Guerrier, Ferrer, Fabian, Sweat, Johnson, Jones, and Maurice Murphy, with conspiracy to distribute and possess with intent to distribute the following quantities of controlled substances, in violation of Title 21, United States Code, Section 846: (1) for defendants Guerrier, Ferrer, and Fabian, five kilograms and more of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); and (2) for defendants Sweat, Johnson, Jones, and Murphy, five hundred grams and more of cocaine, in violation of Title 21, United States Code, Sections 841(b)(1)(B).  Sweat, Johnson, Jones and Murphy were arrested on April 18 and the case was assigned to Your Honor, *United States* v. *Edwin Guerrier, et al.*, 18 Cr. 284 (KMK).  A grand jury returned a superseding indictment on November 7, 2018, maintaining the same charges and adding one defendant, Torren Stubbs, who was charged with participating in the same conspiracy to distribute and possess with intent to distribute, five hundred grams and more of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B).

## ARGUMENT

### I.    Judge Seibel Properly Authorized Interceptions Pursuant to Title III

#### A.    Applicable Law

##### 1.    The Requirements of the Wiretap Statute

Before authorizing a wiretap, an issuing court must find probable cause that: (i) that an individual is committing, has committed, or is about to commit an enumerated offense; (ii) that particular communications concerning that offense will be obtained through the requested interception; and (iii) that the facilities subject to interception are being used in connection with the offense.  18 U.S.C. § 2518(3); *see also United States v. Yannotti*, 541 F.3d 112, 124 (2d Cir. 2008); *United States v. Diaz*, 176 F.3d 52, 110 (2d Cir. 1999); *United States v. Wagner*, 989 F.2d 69, 71 (2d Cir. 1993); *United States v. Ambrosio*, 898 F. Supp. 177, 181 (S.D.N.Y. 1995).

4

Probable cause requires that the totality of the circumstances reflect a fair probability of finding evidence of a crime. *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also, e.g., Diaz*, 176 F.3d at 110 (noting that probable cause standard for wiretap is same as probable cause standard for search warrant). The issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that . . . evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "Probable cause is not an especially demanding standard in this context. '[O]nly the probability, and not the *prima facie* showing, of criminal activity is the standard of probable cause." *United States v. Bellomo*, 954 F. Supp. 630, 636 (S.D.N.Y. 1997) (quoting *Gates*, 462 U.S. at 235) (alteration in original). "Probable cause to issue a wiretap order exists when the facts made known to the issuing court are sufficient to warrant a prudent man in believing that evidence of a crime could be obtained through the use of electronic surveillance." *United States v. Ruggiero*, 824 F. Supp. 379, 398 (S.D.N.Y. 1993), *aff'd*, 44 F.3d 1102 (2d Cir. 1995) (citation and footnote omitted).

## 2.    The Standard of Review

The issuing court's determination of probable cause is entitled to "substantial deference." *See Wagner*, 989 F.2d at 72; *Gates*, 462 U.S. at 237 n.10. "[W]iretap orders are entitled to a presumption of validity." *Ambrosio*, 898 F. Supp. at 181 (citing *United States v. Fury*, 554 F.2d 522 (2d Cir. 1977)). "[A]ny doubts as to the existence of probable cause should be resolved in favor of upholding the authorization." *United States v. Labate*, No. 00 Cr. 632 (WHP), 2001 WL 533714, at *16 (S.D.N.Y. May 18, 2001) (citation omitted); *Ambrosio*, 898 F. Supp. at 181. The reviewing court's role is to "decide if the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Concepcion*, 579 F.3d 214, 217 & n. 1 (2d Cir. 2009). "'[I]n determining the sufficiency of the application a reviewing

court must test it in a practical and commonsense manner.'" *United States v. Torres*, 901 F.2d 205, 231 (2d Cir. 1990) (citation omitted) (alteration in original).

The defendant "bears a significant burden" when seeking to suppress an authorized wiretap of proving that probable cause was lacking. *See, e.g.*, *United States v. Sang Bin Lee*, No. 13 Cr. 461 (JMF), 2014 WL 144642, at *3 (S.D.N.Y. Jan. 14, 2014). In trying to meet its burden, a defendant may not "dissect each piece of information in the [agent's] affidavit to show that each fact taken alone does not establish probable cause." *United States v. Gangi*, 33 F. Supp. 2d 303, 306 (S.D.N.Y. 1999); *see also United States v. Salas*, No. 07 Cr. 557 (JGK), 2008 WL 4840872, at *3-4 (S.D.N.Y. Nov. 5, 2008); *United States v. Scala*, 388 F. Supp. 2d 396, 402-403 (S.D.N.Y. 2005).

Moreover, it is a bedrock principle of law in this Circuit that wiretapping "is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987). And where there is a conspiracy at work, the necessity of a wiretap is even more compelling: "the clandestine nature of alleged conspiracies makes them relatively less susceptible to normal investigative techniques." *United States v. Feola*, 651 F. Supp. 1068, 1105 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).

### 3.    The Necessity Requirement

Before authorizing a wiretap under Title III, a judicial officer must find, among other things, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Accordingly, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This requirement

ensures that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974).

However, this "alternative means" requirement is not "an insurmountable hurdle and only requires that the Government demonstrate that normal investigative techniques would prove difficult." *See, e.g., Labate*, 2001 WL 533714, at *13 (citations omitted). Title III also does not establish a "requirement 'that any particular investigative procedure be exhausted before a wiretap may be authorized.'" *United States v. Young*, 822 F.2d 1234, 1237 (2d Cir. 1987) (citation omitted). Moreover, "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely." *Concepcion*, 579 F.3d at 218. Indeed, although "generalized and conclusory statements that the other investigative procedures would prove unsuccessful" are not sufficient, "the Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance." *Id.* Title III "only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *Id.* Courts, therefore, must take a "commonsense approach" to the necessity requirement. *Id.*

### 4. Minimization Procedures

Title III provides that every court order authorizing a wiretap "shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communication not otherwise subject to interception." 18 U.S.C. § 2518(5). Title III "does not forbid the interception of all non-relevant conversations, but rather instructs agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott v. United States*, 436 U.S. 128, 139-40 (1978). Courts apply an "objective reasonableness" standard when determining whether monitoring agents acted in compliance with

7

the statute.  *Id.* at 136-37 (finding that the existence of a minimization violation "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time").

"'[T]he mere fact that every conversation is monitored does not necessarily render the surveillance violative of the minimization requirement of the statute . . . [N]o electronic surveillance can be so conducted that innocent conversation can be totally eliminated." *Salas*, 2008 WL 4540872, at *6 (S.D.N.Y. Nov. 5, 2008) (citation omitted).  Indeed, courts have found that "minimization is generally inapplicable to calls of less than two minutes in duration because they are 'too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation." *United States v. Menendez*, No. 04 Cr. 219 (DAB), 2005 WL 1384027, at *3 (S.D.N.Y. June 8, 2005) (quoting *United States v. Capra*, 501 F.2d 267, 275-76 (2d Cir. 1974) (quotation in original)).

The government bears the burden of showing compliance with the minimization requirements of Title III.  *See United States v. Rizzo*, 491 F.2d 215, 217 n. 7 (2d Cir. 1974). "Once a *prima facie* showing is made, the burden shifts to the defendant to show that, despite a good faith compliance with the minimization requirements, a 'substantial number of nonpertinent conversations have been intercepted unreasonably." *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2010 WL 4867402, at *27 (S.D.N.Y. Nov. 24, 2010) (citation omitted).

## B.    Discussion

### 1.    The Guerrier Wiretaps Were Supported by Probable Cause

Defendants make no meaningful argument that Judge Seibel was wrong to conclude that there was probable cause to believe that Edwin Guerrier was using the 8586 Number as part of a narcotics conspiracy.  Agent Bryceland explained that Guerrier, using the 8586 Number, was selling narcotics to the confidential informant, and that toll records showed that the 8586

8

Number was, in turn, in contact with the telephone numbers of other known or suspected drug dealers, including the number which William Jones provided to the confidential informant. *See, e.g.*, *Yannotti*, 541 F.3d at 124.

Tamika Sweat states in her brief, off-handedly, that the Guerrier Wiretaps issued "without probable cause" "as to SWEAT at the time of the issuance of the eavesdropping warrants," but her only basis for that conclusion is that the Bryceland Affidavits "do <u>not</u> refer to SWEAT as a target or subject of the investigation" or "refer to Sweat at all." Motion at 2, 6–7. Whether or not Sweat was identified in the affidavits as a Target Subject[2] is irrelevant to whether there was probable cause to believe that *Edwin Guerrier* was using the Target Cellphone as part of his narcotics conspiracy. Some time after Judge Seibel issued the authorization on January 18, the Government concluded that there was probable cause to believe that Tamika Sweat had committed narcotics conspiracy. Indeed, one of the major purposes of Title III is to allow the Government to determine other conspirators involved who have not been identified through normal investigative techniques. *See generally United States v. Kahn*, 415 U.S. 143, 156 (1974) (recognizing, as in this case, that the wiretap was "was needed to 'reveal the identities of [the main target's] confederates, their places of operation, and the nature of the conspiracy involved.'").

### 2. Agent Bryceland's Affidavits Satisfied the Necessity Requirement

Sweat argues that Agent Bryceland's Affidavits did not satisfy the necessity requirement of Title III. Sweat argues that the FBI was using techniques (a confidential informant making controlled phone calls; pole camera; toll records; GPS monitoring), which were successfully

---

[2] Sweat does not argue that the Government erred by failing to name her as a Target Subject in Agent Bryceland's February 16 or March 19 Affidavits. Even if the Government's failure to do so was a mistake, however, it provides no basis to suppress either the Guerrier Wiretaps as a whole or any conversations between Guerrier and Sweat. *See, e.g, United States v. Lambus*, 897 F.3d 368, 394–95 (2d Cir. 2018).

gathering evidence (Sweat Motion at 6–7). Sweat also castigates the FBI and the Government for failing to use other techniques, like an undercover officer; cooperating witnesses; physical surveillance; GPS monitoring; grand jury process; and search warrants. (*Id.*) But Sweat mischaracterizes the FBI's investigation, and the Bryceland Affidavits make clear that just because Sweat's suggested investigative techniques were "theoretically possible," they were "unlikely to succeed if tried."

First, Sweat's conclusion that the Government "stopped using physical surveillance" prior to the issuance of the first eavesdropping warrant, is based on a misreading of Agent Bryceland's January 2018 Affidavit. Agent Bryceland declared that "[s]ustained physical surveillance" was too dangerous and ineffective, Exhibit C at 24–25, but that "strategic physical surveillance," in conjunction with the Wiretaps, would be more effective. And the subsequent affidavits confirm that the FBI did precisely that, establishing physical surveillance on January 20, 2018, to observe a man appear to deliver narcotics to Guerrier at his house, Exhibit C at 51–53, identify Guerrier's travels to the suspected home of Maurice Murphy in March 2018, and ultimately, identify Carlos Fabian and Fernando Ferrer, Exhibit C at 86–92.

Second, the Bryceland Affidavits explained, in detail, "the nature and progress of the investigation and [] the difficulties inherent in the use of each of the law enforcement methods," *Concepcion*, 579 F.3d at 218, that Sweat suggests the Government should have used:

- With respect to the use of the confidential informant and controlled phone calls, the Bryceland Affidavits set forth, in detail, the limitations of the continued use of confidential informants, in that the informant was a customer of Guerrier's with a "limited" "ability to learn more about the scope of Guerrier's drug trafficking activity." (January 18 Bryceland Aff. 24).
- Agent Bryceland explained the limitations of the pole camera to Judge Seibel: while the camera was "helpful," it only captured images of street-level cocaine sales, not audio or meetings inside the barbershop or in other locations, or transactions with a supplier. (January 18 Bryceland Aff. 25).

- Agent Bryceland similarly described the limitations of toll records, which did not allow access to the content of Guerrier's communications with others, and did not necessarily identify the person using the telephone numbers in contact with Guerrier's phone, if the user had not formally subscribed to the number (January 18 Bryceland Aff. 26).
- Agent Bryceland explained why the GPS data, though helpful, could not identify Guerrier's exact location at any specific time.  Further, while Sweat asserts the FBI may have been able to identify her without the Wiretaps, the lawful purpose of the Wiretap was to identify "all of the members of the conspiracy, the means and methods by which narcotics and narcotics proceeds are stored and transported, or the source of the drug supply." (January 18 Bryceland Aff. 26).

Agent Bryceland similarly explained why use of an undercover, cooperating witnesses, grand jury process, and search warrants were inadequate as of January 18, 2018:

- While an undercover officer may have been "specially trained in conducting narcotics investigations," Sweat can only hypothesize that "over time," the undercover would have "undoubtedly" been able to further penetrate Guerrier's narcotics conspiracy.  (Sweat Motion at 7.)  Not only did Agent Bryceland explain why an undercover would not provide any additional information beyond what the informant had been providing, (January 18 Bryceland Aff. 23), Sweat's theorizing is inconsistent with the Second Circuit's holding in *Concepcion* forbidding such speculation.
- The same is true for cooperating witnesses: Sweat simply only speculates  that such individuals would have been able to penetrate Guerrier's DTO.
- And Agent Bryceland explained why grand jury subpoenas, lay witness interviews, and search warrants were unlikely to succeed (until the end of the investigation, when the search warrant was actually executed, on March 22)[3]: witnesses had not yet been identified, or were themselves involved in Guerrier's narcotics trafficking; and search warrants would only be appropriate once the FBI identified stash locations and identified times when significant quantities of narcotics would be store there (January 18 Guerrier Aff. 27–28).

Ultimately, as the Second Circuit has repeatedly explained, "[t]he statute only requires that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  *See Concepcion*, 579 F.3d at 218 (quoting *United States* v. *Diaz*, 176 F.3d 52, 111 (2d Cir. 1999)).

---

[3]  In defense of his argument that the search warrant of his house issued without probable cause, Guerrier in turn argues that the Government could not even have obtained a search warrant of Guerrier's residence as an alternative investigative technique.  (Guerrier Motion at 7).

Agent Bryceland's detailed affidavits certainly did that.  The Court should thus should defer to Judge Seibel's well-reasoned determination that interception of Guerrier's telephone was necessary because normal investigative techniques were unavailable, had failed, were too dangerous, or had not succeeded and would not reasonably be expected to succeed in accomplishing all of the goals of the investigation.  *See, e.g.*, *Ruggiero*, 726 F.2d at 924; *Young*, 822 F.2d at 1237.

### 3.  Sweat's Minimization Argument is Frivolous

Sweat also states, without any citation to case law or specific argument, that the Government intercepted her communications "without adequate minimization."  (Sweat Motion at 2, 4 ("SWEAT's captured conversation were not adequately minimized in accordance with 18 U.S.C. §2518(5)")).  But Sweat does not cite any calls that were allegedly improperly monitored, and even a cursory review of the messages and calls which she appends to her motion are either relevant to criminal conduct, or properly minimized.  For instance, in Session 614, on page 3 of Exhibit B, was marked by the reviewing agents as non-pertinent, after it was determined to not relate to narcotics trafficking.  In Session 2146, the reviewing agents marked the call as non-pertinent, and spot-checked periodically to determine whether the call began to involve criminal activity.  These short calls are, first of all, likely "too brief a period for an eavesdropper even with experience to identify the caller and characterize the conversation."  *Capra*, 501 F.2d at 275-76; second of all, the defendant has not shown that a "substantial number of nonpertinent conversations have been intercepted unreasonably.'"  *Rajaratnam*, 2010 WL 4867402, at *27.

## II.   The FBI's Search of Guerrier's Home was Lawful

### A.   Applicable Law

#### 1.  Probable Cause

A judge's finding of probable cause is afforded significant deference.  "A reviewing court

must accord substantial deference to the finding of an issuing judicial officer that probable cause exists . . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).  Moreover, as the Supreme Court recently reiterated, "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  "A judge's probable-cause determination is not overly strict. Presented with a warrant application, the judge must 'simply . . . make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

"The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235).  Moreover, "[p]robable cause is a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 232).  Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231).  "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).  Such determinations must be approached in a practical

way, because "probable cause is a flexible, common-sense standard." *Gates*, 462 U.S. at 231-32; *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id.* at 231-32.

Once a warrant has been issued by a judge and executed, the duty of a court reviewing a magistrate judge's probable cause determination on a motion to suppress is far more limited: its task is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The issuing magistrate's decision is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (internal quotation marks omitted). Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). "Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232, 236). Thus, as described in *Clark*, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

As to the issue of staleness, "[i]n determining whether probable cause exists, the magistrate is required to assess whether the information adduced in the application appears to be

current, i.e., true at the time of the application, or whether instead it has become stale." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). "Narcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness. Indeed, if a criminal enterprise is appropriately extended, information can remain fresh for probable cause purposes for years." *United States v. Feola*, 651 F. Supp. 1068, 1090 (S.D.N.Y. 1987) (internal citations omitted). "Facts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence." *Wagner*, 989 F.2d at 75; *United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) ("Given the continuous nature of narcotics conspiracies . . . the approximately 18-month delay between procuring the informants' statements and seeking the wiretap warrant did not render the information stale.")

### 2. Good Faith

Even if a warrant lacks probable cause or particularity, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144; *see also Rosa*, 626 F.3d at 64, 66. As a result, exclusion should be a "last resort" rather than a "first impulse." *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 140). Thus, suppression will generally not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). Although the burden is on the Government to establish good faith, "[s]earches pursuant

15

to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Id.* (citations omitted) (internal quotations omitted); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause").

Accordingly, in light of this exception, "the Supreme Court [has] strongly signaled that most searches conducted pursuant to a warrant would likely fall within [the] protection" of the good faith exception. *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (citing *Leon*, 468 U.S. at 922). Indeed, there are only four narrow circumstances in which the good-faith exception does not apply: "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable". *Id.* (quotation marks and citations omitted).

### B.    Discussion

#### 1.    Judge Smith Correctly Found There Was Probable Cause to Search Guerrier's Home

Judge Smith had a "substantial basis," *Gates*, 462 U.S. at 238–39, for concluding that there was probable cause as of March 20, 2018, that Guerrier's house would contain drugs, drug proceeds, and/or documents related to drug dealing.

In the search warrant affidavit, Agent Bryceland described his more than 20 years' experience as an FBI Special Agent, and his participation in numerous prior investigations into narcotics trafficking. (Guerrier Search Warrant ¶ 1). Agent Bryceland explained that Guerrier

had been selling cocaine, over the course of about 4 months and until December 2017, to a confidential informant. (Guerrier Search Warrant ¶ 8). He described multiple investigative steps by the FBI into Guerrier's narcotics dealing, including Title III Orders of Interception, GPS monitoring, surveillance and a pole camera. (Guerrier Search Warrant ¶¶ 5, 7, 9, 10–12). He mentioned that during the course of the investigation, Guerrier "had discussed narcotics trafficking with co-conspirators." (Guerrier Search Warrant ¶ 5). Agent Bryceland explained that from the various investigative techniques, and then confirmed by surveillance, the FBI had determined that Guerrier resided at 1113 Maggie Road. (Guerrier Search Warrant ¶¶ 13, 14). He highlighted that on at least one occasion, the FBI surveilled as Guerrier left the house, and drove through Newburgh, ultimately to meet with the confidential informant and sell him cocaine. (Guerrier Search Warrant ¶ 14).

He then described, broadly, his conclusion that Guerrier received large quantities of cocaine at the residence, (Guerrier Search Warrant ¶ 15), and cited to specific intercepted telephone calls to demonstrate precisely the basis for that conclusion. (Guerrier Search Warrant ¶¶ 16–23). In those telephone calls, Guerrier and a man using a number ending in 8151 (as described in the Complaint in this case, the man was Carlos Fabian, Guerrier's co-defendant), spoke about meeting. In some of those conversations, the two men used what appeared to be code terms ("school time," Guerrier Search Warrant ¶¶ 17, 22; "grocery," Guerrier Search Warrant ¶ 23). Agent Bryceland described that based on his training, experience, and participation in the investigation, he believed when Fabian told Guerrier they would meet on January 20 at "school time," this was a reference to a narcotics transaction. (Guerrier Search Warrant ¶ 17). And the next day, early in the morning, law enforcement saw a man drive up and then enter Guerrier's residence, and then exit. (Guerrier Search Warrant ¶ 19). On January 26, Guerrier told Fabian

17

he needed to pay him "for what I owe you." (Guerrier Search Warrant ¶ 20). Agent Bryceland explained that based on his training and experience, he believed this was for the prior narcotics transaction. When a man drove the same car as previously and entered and then exited Guerrier's residence, he was holding a bag. (Guerrier Search Warrant ¶ 21). Guerrier and Fabian agreed to meet at "school time" on February 13 (Guerrier Search Warrant ¶ 22), Fabian told Guerrier the "grocery" would soon be brought to Guerrier, and law enforcement saw a man operating the same car as the prior dates exit his car and enter and then exit Guerrier's residence. (Guerrier Search Warrant ¶ 23).

These facts provided far more than sufficient information for Judge Smith to conclude that Guerrier's residence contained drugs, drug proceeds, or documents related to narcotics trafficking, as requested by Agent Bryceland in the Guerrier Search Warrant itself (Guerrier Search Warrant Attachment A): Guerrier, who was conspiring to distribute and actually had distributed cocaine, was living at the residence, had cars located at the residence, on at least one occasion sold cocaine soon after leaving the residence, and on at least three occasions, allowed a man to enter his house to engage in what an experienced FBI Special Agent believed and described in detail to be narcotics sales or payments.

In response, Guerrier tries to pick apart various elements of Agent Bryceland's affidavit, instead of considering the totality of the facts together, as Judge Smith was required to. *See, e.g.*, *Gates*, 462 U.S. at 245 n. 14 (criticizing the dissent's "line-by-line scrutiny" which is "inappropriate in reviewing [the] magistrate's decisions"). Much of his criticism of the affidavit is speculation, which is inconsistent with the Supreme Court's long-standing warning that "probable cause is not a high bar," *Wesby*, 138 S. Ct. at 586, and not subject to the "fine resolution of conflicting evidence" applicable in other legal proceedings. *Gerstein v. Pugh*, 420

18

U.S. 103, 121 (1975)

Guerrier first argues that given the relatively "small" quantities purchased by the confidential informant, the affidavit does not establish that Guerrier would need to store large quantities of drugs in his house, and instead that he "could well have" received cocaine for resale in some other location. But that is itself mere speculation, and regardless, is inconsistent with what Agent Bryceland actually requested from Judge Smith: not only a warrant to search for drugs themselves, but also financial proceeds from prior drug sales, which logically would be stored in Guerrier's house.

Guerrier also argues that the controlled-buy information was stale by the time of the search warrant, since the controlled buys ended by December 2017. But as Agent Bryceland explained, Guerrier was involved in a narcotics conspiracy, and the affidavit establishes a pattern of continuing criminal activity including intercepted telephone calls about narcotics from January and February 2018. This is "the very paradigm" of a continuing enterprise in which information can remain fresh for "years." *See, e.g.*, *Feola*, 651 F. Supp. at 1090; *Rowell*, 903 F.2d at 903.

Guerrier's last gambit, that the intercepted wire communications do not demonstrate that Guerrier was receiving drugs or storing drug proceeds at his house, is similarly unavailing. First, Judge Smith was allowed to credit Agent Bryceland's interpretation of the communications, given his decades-long tenure with the FBI. *Gates*, 462 U.S. at 232. Second, Agent Bryceland's interpretation of the intercepted calls is consistent with common sense. The intercepted communications from January 19 show the two men used code words ("school time") to discuss their meeting the next day. The men used other code words ("grocery") before other meetings. That use of code words, and the repeated meetings between the man in the sedan and Guerrier at

Guerrier's house, is only consistent with ongoing illegal activity at Guerrier's residence through at least February 2018.

When reviewing the totality of the factual assertions in Agent Bryceland's affidavit together, it is clear that there was a "substantial basis" for Judge Smith's determination of probable cause.

**2. In the Alternative, the Agents Relied on Judge Smith's Warrant in Good Faith**

While Guerrier correctly cites the law on good faith reliance on a search warrant, he simply elides any analysis for why the FBI's reliance on Judge Smith's warrant was in bad faith, merely stating the affidavit "is so lacking in indicia of probable cause as to render reliance upon it unreasonable." (Guerrier Motion at 6). Needless to say, even were the Court to determine that Judge Smith erroneously issued the warrant, there were numerous indicia of probable cause in Agent Bryceland's affidavit, including the fact that Guerrier was dealing cocaine, that he was involved in a narcotics conspiracy, and that he lived at the address. *Contra Clark*, 638 F.3d at 103 ("[s]uch a concern most frequently arises when affidavits are bare bones"). The agents relied on the search warrant issued by Judge Smith in good faith, and there is thus no basis to suppress the fruits of that search.

**III. The Court Should Reject Tamika Sweat's Motion for a Bill of Particulars**

**A. Applicable Law**

It is well established that the proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). "A bill of particulars should be required only

where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234 (internal quotation marks omitted). If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required. *See Bortnovsky*, 820 F.2d at 574; *United States v. Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003). In other words, the defense cannot use a bill of particulars as a general investigative tool, *United States v. Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973), or as a device to compel disclosure of the Government's evidence prior to trial. *See United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)); *see also United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed." *Triana-Mateus*, 2002 WL 562649, at *5.

**B.    Discussion**

The Superseding Indictment specifies an overt act that Tamika Sweat committed; the Government has provided voluminous discovery; and all of the information she seeks is provided in the indictment or discovery. Thus, Sweat is simply trying to use her motion for a bill of particulars as an inappropriate investigative tool, and her motion should be denied. *Torres*, 901 F.2d at 234.

**IV.    The Superseding Indictment is not Duplicitous as to Tamika Sweat**

**A.    Applicable Law**

"An indictment is duplicitous if it joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992). The Second Circuit has held, however, that the application of the so-called duplicity doctrine poses "unique issues" in the

context of conspiracy charges because "a single agreement may encompass multiple illegal objects." *United Sates v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980); *see also United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) (holding that a narcotics conspiracy count was not duplicitous even though it aggregated multiple narcotics transactions). "It is well established that '[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'" *Braverman v. United States*, 317 U.S. 49, 54 (1942) (citation omitted).

### B.    Discussion

There is simply no merit to Sweat's argument that the dual object conspiracy charged in Count One of the Indictment is duplicitous. All defendants are charged as part of the same conspiracy, but the object for Guerrier, Fabian, and Ferrer was distributing 5 kilograms and more of powder cocaine, and for Sweat, Murphy, Johnson, Jones, and Stubbs, the object was distributing 500 grams and more of cocaine. The hypothetical concerns raised by Sweat about unanimity are simply ungrounded: the only way for the jury to convict her under this Indictment is to find her guilty of conspiring to distribute 500 grams and more of cocaine.

Sweat suggests that the Government should instead charge her (and the other defendants charged with the (b)(1)(B) conspiracy) in a separate conspiracy. This suggestion is both ungrounded in the law and ungrounded in the facts. As the overt act charges, Sweat conspired with *Guerrier*, not necessarily the other individuals in the Indictment, to distribute cocaine. Guerrier may have had a different object than did Sweat, but that does not mean that Sweat did not conspire with him to distribute cocaine.

### V.    There is No Basis to Sever Eugene Johnson's Case From his Co-Defendants'

### A.    Applicable Law

Rule 8(b) of the Federal Rules of Criminal Procedure sets forth the standard that governs joinder of offenses and defendants. *United States v. Turoff*, 853 F.2d 1037, 1043 (2d Cir. 1988). The rule provides, in relevant part, that a single indictment "may charge 2 or more defendants if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The Second Circuit has interpreted Rule 8(b) to allow joinder of offenses and defendants where two or more persons' "criminal acts are 'unified by some substantial identity of facts or participants' or 'arise out of a common plan or scheme.'" *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges, at the discretion of the trial court, to avoid prejudice to a defendant or the Government. The Supreme Court has made plain, however, that there is a "preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998). This preference reflects a settled precept in criminal law: "Joint trials 'play a vital role in the criminal justice system,'" as "[t]hey promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *United States v. O'Connor*, 650 F.3d 839, 858 (2d Cir. 2011) (quoting *Zafiro*, 506 U.S. at 537) (internal citations omitted). Therefore, any analysis of prejudice under a Rule 14 motion must be viewed through the lens of the strong presumption in favor of joint trials.

Thus, even where joint trials invite some prejudice to defendants, "[t]he risks of prejudice attendant in a joint trial are presumptively outweighed by the conservation of time, money, and

23

scarce judicial resources that a joint trial permits." *United States v. Jimenez*, 824 F. Supp. 351, 366 (S.D.N.Y. 1993); *see also United States v. Guerrero*, 669 F. Supp. 2d 417, 424 (S.D.N.Y. 2009). In light of this presumption, even if a particular defendant is somehow prejudiced by joinder, the issue under Rule 14 is whether that prejudice "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (citation omitted).

It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]"; rather, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 540, 539. Consequently, "[t]he principles that guide the district court's consideration of a motion for severance usually counsel denial." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993). Indeed, the Supreme Court has instructed that even when the risk of prejudice is high, measures less drastic than severance—such as appropriate limiting instructions—often suffice as an alternative to granting a Rule 14 motion. *Zafiro*, 506 U.S. at 539.

### B. Discussion

Johnson simply repeats the ample case law, and asserts, as a matter of course, that the Court would not be able to ameliorate potential spillover through jury instructions or other remedial measures – an argument directly at odds with *Zafiro*. Indeed, none of the cases that Johnson cites actually severed a defendant's case from those of his co-conspirators.

Johnson suggests that his potential defense, that he had a buyer/seller relationship with Guerrier, may be compromised by his continued joinder with the other defendants on the indictment. He provides no case law, however, that the correct remedy for this problem is a

severance.  Instead, like any defendant with any particular specific defense, if Johnson goes to trial, the Court should appropriately instruct the jury regarding any issues unique to Johnson.

## VI. The Government Will Not Seek to Introduce Edwin Guerrier's Statements to Law Enforcement as Part of Its Case-In-Chief

Guerrier moves to suppress various statements he made to law enforcement officers after he was arrested, and after he had informed the officers that he did not wish to speak with them and that he wanted to consult with an attorney.  While the Government believes that, as per Guerrier's attorney's own declaration, none of the "questions" posed to Guerrier by the agents were "reasonably likely to elicit an incriminating response from him," *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), the Government does not plan to use any of his statements in its case-in-chief, so his motion is moot.

### CONCLUSION

For the foregoing reasons, Guerrier's motion to suppress the statements he made to law enforcement is moot, and the defendants' remaining motions should be denied

Dated: White Plains, New York
       February 8, 2019

                                    Respectfully submitted,

                                    GEOFFREY S. BERMAN
                                    United States Attorney for the
                                    Southern District of New York

                            By:     _____/s/_____
                                    Samuel L. Raymond
                                    Assistant United States Attorney
                                    (914) 993-1946