**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 18, 2020

**BY ECF AND EMAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    <u>United States</u> v. <u>Edwin Guerrier</u>, 18 Cr. 284 (JSR)

Dear Judge Rakoff:

    The Government respectfully submits this letter in advance of sentencing of defendant Edwin Guerrier, currently scheduled for September 23, 2020 at 04:00 p.m., and in response to defendant's sentencing memorandum dated September 15, 2020 ("Guerrier Memo").

    Edwin Guerrier was one of the largest distributors of cocaine in the City of Newburgh, dealing dozens of kilos of cocaine from no later than 2014 up until his arrest in March 2018. Newburgh, 70 miles north of New York City and with just a tiny fraction of its population, has been riddled by drug dealing and violent crime for years. Guerrier decided to leave his legitimate employment and instead profit, to the tune of tens of thousands of dollars a year, by distributing poisons into his community. Guerrier paid his suppliers to drive from the Bronx to Newburgh with kilo quantities of cocaine which Guerrier could in turn break down into smaller amounts to re-sell. Guerrier knew well that what he was doing was wrong, and the consequences of his large-scale drug operation: Guerrier was convicted of a drug offense in 2000, and ultimately served about eight months' after a sentence of one to five years. But that prior period of incarceration did nothing to deter him from leading the vast narcotics conspiracy charged in the Indictment. When he was arrested, red-handed in March 2018, with three kilograms of cocaine, he did not plead until the eve of trial, which required the Government to prepare assiduously.

    As a result of leading a huge cocaine distribution ring from his home, Guerrier faces a Guidelines range of between more than 15 and almost 20 years, 188 to 235 months' imprisonment. The Government respectfully requests that the Court sentence him to such a substantial period of incarceration, well above the statutory mandatory minimum, to reflect the seriousness of Guerrier's offense, protect the City of Newburgh from his dangerous narcotics trafficking, and to deter both Guerrier and others from committing such heinous offenses in the future.

Hon. Jed S. Rakoff  Page 2
September 18, 2020

**A. Instant Offense Conduct**

Beginning in March 2017, the FBI's Hudson Valley Safe Streets Task Force, working with the Orange County Sheriff's Office and City of Newburgh Police Department, began investigating a cocaine trafficking organization in Newburgh. (Presentence Investigation Report, "PSR," ¶ 16). Over the course of the investigation, a confidential informant bought hundreds of grams of cocaine from Guerrier. (PSR ¶ 16). Based on the controlled purchases and other information, the FBI obtained a Title III wiretap of Guerrier's phone, lasting more than 60 days.

The wiretap proved that Guerrier was a large-scale dealer at the apex of a drug trafficking organization in Newburgh. Guerrier received kilo quantities of cocaine from Carlos Fabian and Fernando Ferrer, who drove the contraband from the Bronx to Newburgh. (PSR ¶ 17). Guerrier then sold this cocaine to other drug dealers and users in the City of Newburgh, including at an abandoned barbershop. (PSR ¶¶ 18, 21–22). As part of his leadership of this organization, he directed Tamika Sweat, who handled drug deliveries when Guerrier was unavailable. (PSR ¶¶ 18, 21). After the last delivery, on March 22, 2018, FBI agents and officers searched Guerrier's house right after Ferrer had delivered drugs, and found among other things 3 kilograms of cocaine and more than $15,000 cash.

The undisputed facts in the PSR, along with the testimony and evidence at the trial of Guerrier's co-conspirator Fernando Ferrer, establishes that Guerrier dealt far more than 15 kilograms of cocaine over the period of 2014 through March 2018:[1]

- The Government estimates that Guerrier sold, conservatively, on the order of ==3 kilograms total of cocaine== between 2014 through late 2015.

    o At trial, Carlos Fabian testified (Fabian's testimony is included here as Exhibit A) that a co-conspirator of his, "El Rojo", told Fabian that Fernando Ferrer had delivered drugs to Guerrier earlier, "before he [Ferrer] got arrested" in 2015. (Ex. A, p. 126:9–14; *see also* Ex. A, p. 127:3–8 (Fabian testified that he did not need to tell Ferrer where to go, because Ferrer had "gone there before")).

    o Also as described in the PSR, in about 2014, William Jones began receiving relatively small but still re-distribution quantities of cocaine, but quickly increased to buying about 100 grams from Guerrier every 10 days or two weeks. (PSR ¶ 22).

- The evidence at trial establishes that Guerrier received, conservatively, on the order of ==16 kilograms of cocaine== from Fabian and his co-conspirators from late 2015 through the end of 2017 (1 kilogram every 45 days for two years).

    o According to Fabian's credible testimony, Fabian conspired with Ferrer and others to deliver cocaine to Guerrier, from 500 grams to ==2 or 3 kilograms, every 30 to 45==

---

[1] The Government initially estimated in its *Pimentel* letter that Guerrier's conspiracy involved between 50 and 150 kilograms of cocaine, but under a more conservative estimate now takes the position that the conspiracy involved between 15 and 50 kilograms of cocaine.

- days, from about late 2015 to the end of 2017. Ex. A 109:15–21 (Fabian and a man he called "El Viejo" were delivering approximately half a kilogram every month or 45 days from late 2015 to around April 2016, Ex. A 110:17–21, 113:20–23 (from April 2016 to approximately August 2016, El Viejo left to the Dominican Republic and the new conspirator was delivering "two and three kilos" every month), Ex. A 114 (Fabian continued to deal through El Viejo from about end of summer 2016 to the beginning of 2017).

    - And when Fernando Ferrer was released from prison in November 2017, Ferrer began delivering 3 kilograms of cocaine to Guerrier. Ex. A 134:6–14.

- The evidence at trial establishes that Guerrier received at least ==12 kilograms of cocaine== from Fabian and Ferrer from January 18, 2018 through March 22, 2018.

    - Fabian testified, as corroborated by the wiretap evidence including the text messages enclosed as Exhibit B, that Ferrer made at least four deliveries to Guerrier in 2018: January 20 (Ex. A, p. 154–155); February 13 (Ex. A, p. 163–164); March 3 (Ex. A, p. 168–171); and March 22 (Ex. A, p. 181–182).

    - The March 22, 2018 delivery is further corroborated by the circumstances of Ferrer's arrest, in the same white Toyota Camry he drove up to Guerrier's house in Newburgh on each of the other deliveries, and where the FBI found more than $80,000 cash.

**B. Procedural History**

After the execution of the search warrant and seizure of the 3 kilograms of cocaine on March 22, 2018, Guerrier, Fabian, and Ferrer were arrested; Guerrier has been detained ever since. He was indicted, along with six others, in April 2018, on conspiracy to distribute 5 and more kilograms of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A). The Government filed the operative, S4 Indictment, against him in January 2020. Guerrier ultimately pleaded guilty to the charge in that Indictment pursuant to a *Pimentel* letter on January 24, 2020, days before trial against him was to begin. Sentencing has been adjourned to September 23, 2020, at 4:00 p.m., because of the COVID-19 pandemic.

**C. Presentence Investigation Report**

The Probation Office has calculated the Sentencing Guidelines as follows:

- Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and (c)(4), because the conspiracy involved at least 15 kilograms of cocaine, the base offense level is 32, (PSR ¶ 32)[2];

---

[2] At one point in paragraph 32, the PSR erroneously states that "The base offense level is 34," but otherwise, in the right-hand column, correctly calculates the base offense level as 32.

Hon. Jed S. Rakoff                                                                                                                                  Page 4
September 18, 2020

- Pursuant to U.S.S.G. § 2D1.1(b)(12), because Guerrier maintained a premises for the purpose of manufacturing or distributing a controlled substance, two levels are added, (PSR ¶ 33),
- Pursuant to U.S.S.G. § 3B1.1(c), because Guerrier was an organizer, leader, manager, or supervisor of the drug conspiracy, two levels are added, (PSR ¶ 35),
- Pursuant to U.S.S.G. § 3E1.1(a), Guerrier accepted responsibility for his offense, two levels are removed, (PSR ¶ 39),
- As a result, the total offense level is 34. (PSR ¶ 40).

The Government and Probation also calculate that Guerrier has five criminal history points, and is Criminal History Category III, based on the following:

1. On or about June 30, 1993, the defendant was convicted of obstructing governmental administration in the second degree, adjudicated a youthful offender and sentenced to ten weeks' intermittent sentence and 3 years probation.[3] Pursuant to U.S.S.G. § 4A1.2(e), this conviction does not result in any criminal history points. (PSR ¶ 42).

2. On or about January 31, 1994, the defendant was convicted of Criminal Possession of a Controlled Substance in the Seventh Degree, adjudicated a youthful offender, and sentenced to 6 months' imprisonment.[4] Pursuant to U.S.S.G. § 4A1.2(e), this conviction does not result in any criminal history points. (PSR ¶ 43).

3. On or about July 12, 2000, the defendant was convicted of driving under the influence, in violation of New York Vehicle and Traffic Law 1192, and sentenced to a $400 fine. Pursuant to U.S.S.G. § 4A1.2(e), this conviction does not result in any criminal history points. (PSR ¶ 44).

4. On or about March 29, 2001, the defendant was convicted of Attempted Criminal Possession of a Narcotic Drug, in violation of New York Penal Law 220.09, and sentenced to five years' probation. Because he was subsequently resentenced to 1 to 5 years' imprisonment on April 30, 2004, and was incarcerated until December 16, 2004, pursuant to U.S.S.G. § 4A1.1(a), this conviction results in three criminal history points. (PSR ¶ 45).

5. On or about October 15, 2001, the defendant was convicted of reckless driving, in violation of New York Vehicle and Traffic Law 1212, and sentenced to a $200 fine. Pursuant to U.S.S.G. § 4A1.2(e), this conviction does not result in any criminal history points. (PSR ¶ 46).

6. On or about August 12, 2003, the defendant was convicted of reckless driving, in violation of New York Vehicle and Traffic Law 1212, and sentenced to a $200 fine. Pursuant to U.S.S.G. § 4A1.2(e), this conviction does not result in any criminal history points. (PSR ¶ 47).

---

[3] The Government did not include this sentence in the *Pimentel* letter, but it does not change Guerrier's applicable criminal history given its age.
[4] The Government did not include this sentence in the *Pimentel* letter, but it does not change Guerrier's applicable criminal history given its age.

Hon. Jed S. Rakoff                                                                                             Page 5
September 18, 2020

      7. On or about May 21, 2013, the defendant was convicted for separate incidents of driving while intoxicated, in violation of New York Vehicle and Traffic Law 1192; for both, he was sentenced to a conditional discharge and a $1000 fine. Because these incidents were separate, pursuant to U.S.S.G. § 4A1.2(a)(2), each conviction results in one criminal history point, for a total of two points. U.S.S.G. § 4A1.1(c). (PSR ¶¶ 48–49).

      The Sentencing Guidelines Range for this base offense level and criminal history is 188 to 235 months. The Probation Office has recommended that the Court sentence the defendant to 120 months' imprisonment, because he does not have a violent history. (PSR p. 19–21.)

**D.  The Court Should Impose a Significant Sentence Within the Sentencing Guidelines**

      Edwin Guerrier comes from a good home, with two parents who were law-abiding and with whom he shared close relationships. His brothers are law-abiding, productive members of society. Guerrier has children, with whom he also shares a good relationship. In other words, unlike so many other defendants who come before this Court for sentencing, Guerrier had opportunities in his life besides dealing drugs. Those opportunities meant that Guerrier had a choice. After his prior convictions for narcotics in the early 2000s, he could have chosen to maintain lawful employment: he has a CDL license, and is a skilled mechanic. But Guerrier instead decided to become one of the largest traffickers of cocaine in the City of Newburgh. He decided to lead that organization. He decided to link up with huge, kilo-weight suppliers like Carlos Fabian and Fernando Ferrer. He decided to sell his poisons in the City of Newburgh, not only selling directly to users but also larger quantities to other dealers. He decided to earn tens of thousands of dollars through drug dealing. The only appropriate sentence for a person who made such a conscious decision is a significant sentence: not the mandatory minimum of 10 years, as requested by Probation and the defendant, but a sentence of 15 years or more. Only such a sentence could reflect the seriousness of the crime, protect the City of Newburgh from Guerrier, and deter him and others.

      Newburgh is a small city, about 30,000 people. It has unfortunately been an epicenter of drug dealing and violence for many years. And for more than four years, Edwin Guerrier was one of the largest distributors of cocaine there. Newburgh's distance from larger hubs means that, if they can arrange it, drug traffickers like Guerrier can buy from suppliers who live in a larger metropolitan area like New York City at a cheaper price and resell in Newburgh at a premium. That is what Guerrier did: he purchased cocaine, at a shifting price, from Fabian and Ferrer for as cheap as $32,000 a kilogram, and charged larger scale drug dealers to whom he sold for $35 a gram: a profit of at least $3,000 per kilogram, for, from at least January through March 2018, 3 kilograms a month, tax free. His drug operation was so successful that it needed to be tended to even when Guerrier was unavailable: when he was out-of-town, or even when he was just busy, he would direct Tamika Sweat to make drug deliveries or pick up money for drug debts owed. And Guerrier was able to enjoy the material trappings of such profits: a well-kept condominium at 1113 Maggie Road in Newburgh, about a ten minute drive outside of the city where he plied his illegal wares; two large Mercedes-Benzes; a motorcycle (a photograph of which is enclosed as Ex. B); dozens of pairs of shoes (Ex. C); stylish clothes (Ex. D); jewelry (Ex. E); thousands of dollars of cash (Ex. F).

Hon. Jed S. Rakoff  Page 6
September 18, 2020

Guerrier personally profited, but his city and its residents suffered. Addiction follows from the narcotics trade. Guerrier enjoyed a close relationship with his father, and enjoys a close relationship with his mother. The users who bought Guerrier's drugs may very well not be able to form such relationships with their children.

The Government understands your Honor's well-known position regarding the Sentencing Guidelines. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, Federal Sentencing Reporter, Vol. 26, No. 1. But the Government respectfully submits that this is precisely a case where the Guidelines are appropriate. Guerrier was not a passive participant in a conspiracy that happened to traffic in large quantities of drugs. He was the hub, around which the rest of the conspiracy moved. He was Fabian and Ferrer's largest customer, and he was the leader of the organization in the City of Newburgh. He stored his drugs in his safe condo outside of the city, while the users and dealers to whom he sold often lived in more dangerous conditions. He knew the consequences, after his youthful convictions and sentences. A fifteen-year plus sentence is absolutely sufficient, but not greater than necessary, to reflect the seriousness of his criminal conduct and hopefully deter him and others from trying to do the same.

Guerrier's arguments for leniency are insufficient in light of the aggravating factors in his case. Guerrier first asserts that what he oversaw was not a criminal organization, and that he did not supervise anyone besides Tamika Sweat. Guerrier Memo at 5. While it is true that Guerrier supervised only Tamika Sweat and usually dealt with customers who had to pay upfront, he did at times deal drugs on consignment, which meant that he was invested in the dealers he was supplying to sell his product so he could be repaid. (Ex. G, an excerpt of a conversation between Guerrier and Eugene Johnson, in which Guerrier complains about a customer and states "So boom, I gave him somethin. Boom. So, so he doin, he doin, he doin. And then he ain't come out for a couple of days. . . . Then last, then, then I seen him last night, I said 'Yo what's good' . . . I said what the hell? I said, UI, I said, UI, nah, nah, I got somethin. UI, man where my paper at?")

Guerrier next makes the somewhat baffling claim that he "occupied a position at the lowest levels of the distribution chain," because he "sold to lower-level dealers and users." Guerrier Memo at 5. The "lowest level of the distribution chain" would of course be precisely the "lower-level dealers," like William Jones, Eugene Johnson, Maurice Murphy, and Torren Stubbs, who Guerrier supplied. And while Fabian and Ferrer were higher up the distribution chain, Guerrier was their largest customer by far, which is why they entrusted him by frequently selling him drugs on consignment (Ex. A 158).[5]

Guerrier asserts that imposing a longer sentence would be inconsistent with the sentences imposed upon his co-defendants. Guerrier Memo at 6–7. That dog will not hunt. Two of the co-defendants who received time-served sentences (still in excess of two years) cooperated with the Government. *Cf., e.g., United States v. Cabot*, 755 F. App'x 75, 81 (2d Cir. 2018) (rejecting

---

[5] A smaller point: Guerrier does not claim to qualify for the additional one-level reduction for pleading sufficiently in advance of trial, but states that it "bears noting" that the Government had to prepare for the ultimate trial against Guerrier. Guerrier Memo at 5–6. It thus also bears noting that because of Guerrier pleaded guilty so close to trial, the Government had to disclose to Guerrier additional *Giglio* and 3500 material which revealed the identity of one of its cooperating witnesses.

argument that sentence was disparate in reference to sentence imposed on cooperator); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[A] sentencing difference is not a forbidden 'disparity' if it is justified by legitimate considerations, such as rewards for cooperation."). And Tamika Sweat, Maurice Murphy, Torren Stubbs, and Eugene Johnson all had significantly smaller roles in the instant conspiracy than did Guerrier.[6] The better comparison is to other leaders of large-scale narcotics trafficking organizations with similar criminal histories.

Finally, Guerrier argues for a below-Guidelines sentence based on his health issues, and the COVID-19 pandemic. Guerrier Memo at 7–11. But while the Court should take appropriate consideration of these factors under the 3553(a) factors, they only go so far. Guerrier chose to deal huge quantities of drugs, knowing the very real risk of the decades in prison he now faces, while suffering from the same health conditions he does now. There is no basis to provide him with quite the downward variance he now seeks.

### E. Forfeiture and Return of Property

The Government respectfully requests that the Court enter an order of forfeiture of $450,000, with specific property of $96,428 and the two Mercedes Benz's seized from Guerrier's condominium on March 22, 2018; the Government intends to submit that proposed order of forfeiture early next week. Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)). "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989). The purpose of forfeiture is "punitive rather than restitutive," *United States v. Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

The defendant admitted to the forfeiture allegations in the Indictment. PSR ¶¶ 6(j), 104–105. The Government conservatively estimates that Guerrier paid $30,000 per kilogram of cocaine that he purchased from Fabian and Ferrer, and he does not dispute that he distributed at least 15 kilograms. 18 U.S.C. § 981(a)(2)(A) ("[T]he term 'proceeds' . . . is not limited to the net gain or profit realized from the offense."). Accordingly, the Court should require the defendant to forfeit these funds. The Government agrees with the defendant that Guerrier's interest in the cash and the cars seized upon his and Ferrer's arrest be credited against the forfeiture amount, which will be clear in the proposed order.

As the defendant states, the Government does not oppose return of Guerrier's personal property to which the Government makes no claim of forfeiture. Guerrier Memo at 11. The Government has not been able to complete return because of the COVID-19 pandemic. The

---

[6] Guerrier's periodic references to the fact that the jury did not convict Ferrer of 841(b)(1)(A) is also irrelevant. As this Court knows, the Government sought to convict Ferrer of the same crime to which Guerrier pleaded guilty, and intends to seek a sentence above 10 years at Ferrer's sentencing as well.

Hon. Jed S. Rakoff  Page 8
September 18, 2020

Government expects to provide the requested property at the defendant's sentencing, which will moot his motion.

      Edwin Guerrier led a large-scale cocaine trafficking conspiracy in the small and benighted City of Newburgh. He earned tens of thousands of dollars doing so. He knew the consequences for doing so. The Court should impose the sentence Guerrier has thus earned: a sentence within the Guidelines range of 188 to 235 months' imprisonment.

                                              Respectfully submitted,

                                              AUDREY STRAUSS
                                              Acting United States Attorney


                                       By: <u>/s Samuel L. Raymond</u>
                                              Samuel L. Raymond / Jeffrey Coffman
                                              Assistant United States Attorneys
                                              (212) 637-6519

cc: Theodore S. Green, Esq. (via ECF)